# In the United States Court of Federal Claims

| | |
|---|---|
| JENNIFER WILLIFORD and CHARLES EDWARD WILLIFORD, III, parents of R.W., a minor,<br><br>*Petitioners,*<br><br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>*Respondent.* | No. 18-1371[1]<br>(Filed: October 21, 2026) |

*Nichole Glance Booker*, Mast Law Firm, Smithfield, NC, for Petitioners.

*Emilie Williams*, Civil Division, U.S. Department of Justice, Washington, D.C., for Respondent.

**OPINION AND ORDER**

**LERNER,** *Judge*.

Pending before the Court is a motion to review Special Master Jennifer Shah's March 5, 2026 decision denying compensation to Jennifer and Charles Williford, III ("Petitioners"), parents of R.W., under the National Childhood Vaccine Injury Act of 1986 ("Vaccine Act"). Pet'rs' Mot. for Rev. ("Mot."), ECF No. 85. When she was eleven years old, R.W. experienced a severe neurological event resulting in paraplegia, neurogenic bladder and bowel, and scoliosis. *Id.* at 1. While there is no question R.W. and her family have endured a serious medical ordeal, the cause of her condition is disputed. Petitioners claim the Tetanus, Diphtheria, and Acellular Pertussis ("Tdap") and meningococcal vaccines R.W. received on September 11, 2015, caused her to develop transverse myelitis ("TM"), a neurological condition involving inflammation of the spinal cord and causing pain, muscle weakness, paralysis, sensory problems, and bladder and bowel dysfunction. Mot. at 1; *see* Pet'rs' Ex. 8 at 1, 5–6, ECF No. 4-7.

The Special Master found Petitioners failed to establish that the injury suffered by R.W. was TM by a preponderance of the evidence, instead finding R.W.'s case was more akin to acute flaccid myelitis ("AFM"). Decision Denying Entitlement ("Decision") at 45–51, ECF No. 82. According to the Special Master, Petitioners could prove neither the specific injury alleged nor

[1] This Opinion was originally filed under seal on July 30, 2026. The Court provided the parties the opportunity to review the Opinion for any proprietary, confidential, or other protected information and submit proposed redactions no later than August 13, 2026. The parties did not propose any redactions.

that the vaccines at issue caused R.W.'s injury by preponderant evidence. *Id.* at 52; Resp't's Resp. to Mot. for Rev. ("Resp.") at 7–8, ECF No. 89. Petitioners seek review of the Special Master's Decision on grounds that her findings were arbitrary and capricious; they claim the evidence preponderantly shows the vaccine caused R.W.'s injury. Mot. at 7. For the reasons explained below, the Court affirms the Special Master's Decision.

## I. Background

Jennifer and Charles Williford filed their Petition for Vaccine Compensation on September 7, 2018. *See* Petition ("Pet."), ECF No. 1. The Petition included medical records, medical literature, and affidavits from the Willifords. Pet'rs' Exs. 1–18, ECF No. 4. On March 13, 2019, Respondent filed its Rule 4(c) Report contending R.W. is not entitled to compensation under the Vaccine Act. Resp't's Rule 4(c) Rep. at 1, ECF No. 15.

From July 26 to July 28, 2022, former Special Master Katherine Oler held an entitlement hearing to receive testimony from R.W., Mr. and Mrs. Williford, and the parties' medical experts. Minute Entry, *Williford et. al. v. Sec'y of Health & Hum. Servs.*, No. 18-1371 (Fed. Cl. Spec. Mstr. July 28, 2022). Prior to the hearing, the parties each filed two expert reports; after the hearing, they each filed an additional expert report. On August 21, 2023, Petitioners filed their post-hearing brief. *See* Pet'rs' Post-Hearing Brief, ECF No. 75. Respondent filed its responsive post-hearing brief on December 11, 2023. *See* Resp't's Post-Hearing Brief, ECF No. 77. On February 16, 2024, Respondent filed additional medical literature. Resp't's Exs. G–M, ECF No. 79.

On August 13, 2024, the case was reassigned to Special Master Shah. ECF No. 81. Special Master Shah issued a decision on March 5, 2026, finding the preponderant evidence did not establish R.W. suffered from TM and "did not substantiate that either of the subject vaccinations caused R.W.'s injury." Decision at 2. On April 6, 2026, Petitioners filed a Motion for Review of the Special Master's Decision. *See* Mot.

### A. Factual Background

R.W. was born on September 8, 2004. Decision at 3. She received the meningococcal vaccine and her sixth dose of the Tdap[2] vaccine on September 11, 2015, when she was eleven years old. *Id.* at 3, 17. Sixteen days later, R.W. developed difficulty moving her right leg and became unable to walk; she was admitted to Johnston Medical Center and evaluated by emergency medicine specialist Dr. Geeta Subramaniam. *Id.* at 3 (citing Pet'rs' Ex. 2 (Raleigh Pediatric Associates Medical Records) at 154, 157). R.W. reported right thigh pain, decreased ability to use her right leg, and loss of sensation in her left leg. *Id.* (citing Pet'rs' Ex. 2 at 156). She also had a low-grade fever. *Id.* (citing Pet'rs' Ex. 2 at 156–57). Dr. Subramaniam preliminarily diagnosed R.W. with bilateral leg weakness. *Id.* (citing Pet'rs' Ex. 2 at 161–63).

---

[2] The Tdap and DTaP vaccines both protect against tetanus, diphtheria, and pertussis but differ in dosage. *Mohamad v. Sec'y of Health & Hum. Servs.*, No. 16-1075V, 2022 WL 711604, at *14 (Fed. Cl. Spec. Mstr. Jan. 27, 2022). Tdap is a booster that contains lower amounts of diphtheria and pertussis antigens than the childhood DTaP vaccine. *Id.* Although the medical experts in the record may use the terms interchangeably, this Opinion uses "Tdap" to refer consistently to the vaccine received by R.W. on September 11, 2015.

R.W. was emergently transferred to the pediatric intensive care unit ("PICU") at WakeMed Hospital in Raleigh, North Carolina ("WakeMed"). *Id.*

At WakeMed, pediatric critical care physicians Dr. Bridget Donell and Dr. Linh Tran observed minimal strength and absent reflexes in both legs, as well as decreased sensation to touch on the right thigh. *Id.* (citing Pet'rs' Ex. 4A (WakeMed Hospital Medical Records) at 1, 3). They noted her presentation raised concern for Guillain-Barré syndrome ("GBS") or TM, explaining that although her symptoms followed an L3-L4 dermatomal distribution in the right thigh, the absence of a clearly defined sensory level made TM a possible etiology (i.e., cause of the symptoms). *Id.* at 3–4 (citing Pet'rs' Ex. 4A at 4).

MRI studies performed on September 28, 2015, revealed a "very subtle" signal abnormality of the spinal cord at T11-12, a possible second abnormality at T7-8, and subtle T2 signal elevation in the conus nodularis. *Id.* at 4 (citing Pet'rs' Ex. 4A at 107). R.W. was treated with a high-dose steroid. *Id.* (citing Pet'rs' Ex. 4A at 105). Subsequent evaluation by WakeMed pediatric critical care specialists Drs. Travis Honeycutt and Sara Duffus documented absent knee and ankle strength, loss of sensation in the right knee and the surface of the left foot, but partial sensation to touch from the right knee and left foot proximally. *Id.* (citing Pet'rs' Ex. 4A at 106). TM, multiple sclerosis ("MS"), neoplasm, and tick paralysis were each proposed as potential diagnoses, but Dr. Honeycutt believed TM was the most likely diagnosis. *Id.* (citing Pet'rs' Ex. 4A at 108, 109).

WakeMed Pediatric neurologist Dr. John Wooten noted bilateral lower extremity numbness and weakness, as well as urinary incontinence without sensation. *Id.* (citing Pet'rs' Ex. 4A at 116). Based on R.W.'s clinical presentation and imaging, Dr. Wooten considered TM the most likely diagnosis. *Id*. at 5 (citing Pet'rs' Ex. 4A at 118). A repeat thoracic MRI was consistent with inflammatory TM, with neuromyelitis optica ("NMO"), MS, vascular disease, or neoplasm considered less likely. *Id.* (citing Pet'rs' Ex. 4A at 126–27).

On September 29, 2015, while R.W. was still hospitalized, Drs. Honeycutt and Duffus reevaluated R.W. and noted that her recent vaccination raised the possibility of acute disseminated encephalomyelitis ("ADEM"). *Id.* (citing Pet'rs' Ex. 4A at 100, 103). They planned to report an adverse vaccine event. *Id.* (citing Pet'rs' Ex. 4A at 103, 104). They also recorded that R.W.'s rapid test for rhinovirus/enterovirus was positive and noted reports of enterovirus causing similar presentation to R.W.'s symptoms. *Id.* (citing Pet'rs' Ex. 4A at 104).

A week into her hospitalization, R.W. had experienced "only very mild improvement of sensory and motor symptoms." *Id*. at 5–6 (citing Pet'rs' Ex. 4A at 17). On October 6, 2015, she was transferred to Duke Children's Hospital, where Drs. William Gallentine and Sarah Neuhaus evaluated her. *Id.* at 6 (citing Pet'rs' Ex. 5 (Duke Health Medical Records) at 15). After reviewing her imaging, Dr. Gallentine characterized her condition as "Acute Flaccid Paralysis due to likely [TM]." *Id.* (citing Pet'rs' Ex. 5 at 39). Nasopharynx testing was negative for Enterovirus D68 but positive for Human Rhinovirus A29. *Id.* (citing Pet'rs' Ex. 4A at 185). A subsequent spinal MRI showed "[w]orsening ascending inflammatory myelitis." *Id.* (citing Pet'rs' Ex. 5 at 1725).

R.W. began plasmapheresis ("PLEX"), a blood-plasma exchange treatment, on October 8, 2015. *Id.* (citing Pet'rs' Ex. 5 at 35). After five sessions, she showed no improvement. *Id.* at 7 (citing Pet'rs' Ex. 5 at 183). Her repeat MRI showed extension of the long segment TM to T3

and "enhancement of ventrally predominant nerve roots," suggesting the disease may have had a viral cause. *Id.* (citing Pet'rs' Ex. 5 at 183).

On October 18, 2015, R.W. was evaluated by pediatric infectious disease specialists Drs. Robert Drucker and Nazario Chaparro. *Id.* (citing Pet'rs' Ex. 5 at 51). The physicians concluded R.W. did not have preexisting "significant exposure or risk factors" for TM other than rhinitis, but TM has multiple infectious causes, "most of them [of] viral etiology." *Id.* (citing Pet'rs' Ex. 5 at 55–56).

On October 22, 2015, Dr. Carolyn Pizoli conducted a neuroradiology review and expressed "concern about [a] viral infection." *Id.* at 8 (citing Pet'rs' Ex. 5 at 78). That same day, pediatric rheumatologists Drs. Jeffrey Dvergsten and Stephen Balevic noted R.W.'s lack of clinical response to intravenous immunoglobulin ("IVIG"), corticosteroids, or PLEX, observing that an antibody-mediated inflammatory process would have been expected to improve with such treatment. *Id.* (citing Pet'rs' Ex. 5 at 203, 205).

On October 24, 2015, Dr. Gallentine stated that although the precise etiology remained unclear, there was a "high suspicion" of a virally mediated process. *Id.* at 9 (citing Pet'rs' Ex. 5 at 79, 81). Three days later, pediatric neurologists Drs. Edward Smith and Suma Das described R.W.'s condition as having an "unclear etiology, though [a] high suspicion for virally mediated myeloradiculopathy," and indicated the case would be reported to the Centers for Disease Control and Prevention ("CDC") as AFM.[3] *Id.* (citing Pet'rs' Ex. 5 at 88).

R.W. was discharged from Duke on October 30, 2015. *Id.* (citing Pet'rs' Ex. 5 at 4). Her discharge summary stated that, "[a]fter extensive discussion between neurology, rheumatology, and infectious disease, it was determined that her lesion was most likely virally mediated, though the exact etiology was never determined." *Id.* (citing Pet'rs' Ex. 5 at 5–6).

At a follow-up appointment two months later, Dr. Gallentine noted R.W.'s poor response to treatment was somewhat atypical for acute TM. *Id.* at 10 (citing Pet'rs' Ex. 5 at 1724). In April 2016, physiatrist Dr. Tobias Tsai, observed that it remained unclear whether R.W.'s paraplegia "was a manifestation of TM or (possibly more likely) acute flaccid paralysis." *Id.* at 11 (citing Pet'rs' Ex. 2 at 68).

Though not discussed in the Special Master Decision, the record indicates R.W. was seen by her pediatrician on multiple occasions throughout 2016 to treat symptoms both related and unrelated to this illness, including a urinary tract infection, hematuria, fevers, and the flu. *See* Pet'rs' Ex. 2. Each of these symptoms was resolved with medication or time. *Id.* On April 18, 2016, R.W. was diagnosed with scoliosis. Decision at 10 (citing Pet'rs' Ex. 2 at 72). She received a follow-up evaluation for her scoliosis on October 5, 2016. *Id.* at 11 (citing Pet'rs' Ex. 2 at 56).

On May 10, 2017, R.W. underwent spinal fusion surgery for scoliosis, which she tolerated well. *Id.* (citing Pet'rs' Ex. 2 at 11, 46). She began working with a personal trainer in

---

[3] Petitioners produced a letter from Duke's senior manager of health information management stating that "all efforts to locate written communication between the CDC and [Duke] for the above captioned patient has [sic] been unsuccessful." Pet'rs' Ex. 53 (Correspondence from Duke Regarding Request for CDC Documents) at 1.

November 2017 and initiated Botox injections to treat bilateral hip contractures in December 2017. *Id.* (citing Pet'rs' Ex. 16 (B3 Fitness Records) at 1; Pet'rs' Ex. 12 (Carolina Rehabilitation and Surgical Associates Medical Records) at 8). At the time of the July 2022 hearing before the Special Master, R.W. continued to lack sensation from the hips down and remained incontinent. Decision at 13 (citing Tr. at 61).

### B. Issues in Dispute

At dispute in this case are: (1) the relevant diagnosis for R.W.'s injury, and (2) whether R.W.'s condition was caused by the vaccines she received. Petitioners contend R.W.'s proper diagnosis is TM, caused by her September 11, 2015 Tdap and meningococcal vaccinations. Mot. at 7. They challenge the Special Master's conclusion that R.W. more likely developed AFM, which was caused by a virus rather than by the subject vaccinations. *Id.* at 7–13. Respondent argues the Special Master's decision was reasonable, was supported by the record, and must be upheld. Resp. at 5–7.

#### 1. Affidavits and Testimony of Jennifer Williford, Charles Williford, III, and R.W.

Jennifer Williford submitted an affidavit on October 4, 2021, and provided testimony regarding R.W.'s health prior to the onset of her symptoms and subsequent hospitalization. *See* Pet'rs' Ex. 13 ("Mrs. Williford Aff."), ECF No. 4-11; Decision at 11 (citing Tr. at 8–9). She described R.W. as being in good health before vaccination and actively participating in sports and other activities. Mrs. Williford Aff. at 1. She further testified that R.W. had no cold or rhinitis prior to vaccination. Decision at 11–12 (citing Tr. at 14, 16–17). R.W. received the vaccines during a routine well-child visit. *Id.*

Following vaccination, R.W. experienced arm pain, lower back pain, and fatigue. *Id.* at 12 (citing Tr. at 15–18). On September 27, 2015, she began complaining of leg pain and increased fatigue. Mrs. Williford Aff. at 1; Decision at 12 (citing Tr. at 18–19). Later that day, she fell while attempting to stand from her bed, prompting her parents to take her to the hospital. *Id.* (citing Tr. at 19–20). Her father carried her to the car. *Id.* (citing Tr. at 20). At the hospital, while attempting to provide a urine sample, R.W. became "stiff" and experienced an episode of urinary incontinence without sensation. *Id.* (citing Tr. at 22). She was subsequently transferred to WakeMed. *Id.* (citing Tr. at 23–24).

At WakeMed, medical staff assessed R.W.'s sensory loss, which extended to the level of her belly button. *Id.* at 29 (citing Tr. at 411). R.W. was initially diagnosed with TM, and physicians recommended transfer to Duke for further treatment. *Id.* at 12 (citing Tr. at 26, 29). Mrs. Williford reported she requested testing for AFM, and was informed the results were negative. *Id.* (citing Tr. at 30–31, 33).

R.W. remained hospitalized and in inpatient rehabilitation until November 23, 2015. Mrs. Williford Aff. at 2. After her discharge, she continued outpatient physical therapy and home exercises. Decision at 12 (citing Tr. at 43). R.W. was later diagnosed with scoliosis, for which surgery was recommended; the family was advised that the scoliosis was secondary to the TM. *Id.* (citing Tr. at 42–43). Despite treatment, R.W. remained paralyzed from the mid-torso down, wheelchair-bound, and incontinent. *Id.* (citing Tr. at 45).

Mr. Williford submitted an affidavit materially identical to Mrs. Williford's account. *Id.*; *see* Pet'rs' Ex. 14 ("Mr. Williford Aff."), ECF No. 4-11. He also testified that R.W. underwent a nasal swab while hospitalized to test for viral causes and to differentiate between AFM and TM. Decision at 12 (citing Tr. at 47–48). According to Mr. Williford, the results of the test ruled out AFM. *Id.* (citing Tr. at 50–51).

R.W. testified she was in "normal health" before receiving the vaccines. *Id.* (citing Tr. at 54). She reported arm pain on the day of vaccination and mild back pain in the days that followed, but no other symptoms initially. *Id.* (citing Tr. at 55–56). She began feeling more tired than usual in the days leading up to her hospitalization. *Id.* On September 27, 2015, after attending church, she had to lie down due to leg pain. *Id.* (citing Tr. at 56–57). When she later attempted to get up to use the restroom, she fell. *Id.* (citing Tr. at 57). She was evaluated by paramedics at a local fire station and reported reduced but present sensation, including the ability to feel metal touching her foot. *Id.* at 29 (citing Tr. at 406–07). Her parents then took her to the hospital. *Id.* at 13 (citing Tr. at 57–58).

### 2. Treating Physicians and Medical Experts

R.W.'s critical care physician at WakeMed, Dr. Travis Honeycutt, submitted two affidavits regarding her care and his diagnosis of her illness. *See* Pet'rs' Ex. 10 ("First Honeycutt Aff."), ECF No. 4-7; Pet'rs' Ex. 84 ("Second Honeycutt Aff."), ECF No. 56-1. Petitioners' medical expert, Dr. Lawrence Steinman, filed two reports. *See* Pet'rs' Ex. 22 ("First Steinman Rep."), ECF No. 27; Pet'rs' Ex. 49 ("Second Steinman Rep."), ECF No. 37-1. Respondent offered two medical experts, Dr. Neil Romberg and Dr. Michael Sweeney, each of whom filed one report. *See* Resp't's Ex. A ("Romberg Rep."), ECF No. 33-1; Resp't's Ex. C ("Sweeney Rep."), ECF No. 33-3. All three experts testified before the Special Master at the July 2022 hearing. *See* Decision at 21–27. After the hearing, both parties filed additional expert reports from neuroradiologists, Dr. David Wilson (on behalf of Petitioners) and Dr. William Zucconi (on behalf of Respondent). *See* Pet'rs' Ex. 88 ("Wilson Rep."), ECF No. 68-1; Resp't's Ex. D ("Zucconi Rep."), ECF No. 70-1.

After analyzing the expert opinions and hearing testimony, the Special Master found Respondent's experts persuasive and concluded that "[a]lthough R.W.'s case had some ambiguities, the overall record preponderantly favors AFM over TM." Decision at 45. In making her determination, the Special Master relied on the expert analysis of R.W.'s imaging, test results, medical records, treating physician opinions, and scientific literature. *Id.* at 51.

#### a. Treating Physician Affidavit, Dr. Travis Honeycutt

Dr. Travis Honeycutt filed two affidavits addressing R.W.'s diagnosis and the cause of her illness. *See* First Honeycutt Aff.; Second Honeycutt Aff. In his first affidavit, Dr. Honeycutt stated he and other WakeMed physicians diagnosed R.W. with TM "thought to be the result of an adverse vaccine event." First Honeycutt Aff. at 1. He cited medical literature supporting the possibility that TM can develop following vaccination. *Id.* at 2. In his second affidavit, Dr. Honeycutt clarified that R.W.'s discharge diagnosis assigned by physicians at Duke was acute

flaccid paralysis ("AFP"), not AFM.[4] Second Honeycutt Aff. at 1. Dr. Honeycutt noted his own clinical diagnosis of R.W. remained TM. *Id*.

**b. Petitioners' Expert, Dr. Lawrence Steinman**

Dr. Lawrence Steinman, a neurologist and professor of neurology at Stanford University, submitted two expert reports and provided testimony on behalf of Petitioners. *See* First Steinman Rep.; Second Steinman Rep. In his first report, Dr. Steinman advanced a molecular mimicry theory to explain the causal mechanism by which the Tdap and meningococcal vaccines could precipitate TM. First Steinman Rep. at 7. Under this theory, a virus or bacteria evades immune defenses by mimicking amino acid sequences already present in the body, thereby triggering an autoimmune response. *Id.*

Applying this framework to R.W.'s case, Dr. Steinman employed the basic local alignment search tool ("BLAST") to compare the Tdap vaccine with the myelin antigens known to be targeted in TM patients. *Id.* at 12. His analysis revealed a degree of overlap between the amino acids in the tetanus and pertussis toxins and the TM-associated myelin protein "sufficient to trigger an immune response with paralysis," which he argued provided "a compelling theory that molecular mimics in the [Tdap vaccine] received by [R.W.] *could* trigger immunity to myelin basic protein culminating in [TM]." *Id.* at 13, 16.

In his second report, Dr. Steinman addressed R.W.'s rhinovirus infection. Second Steinman Rep. at 1. While acknowledging some studies linking rhinovirus to AFM, Dr. Steinman underscored the prevalence of rhinovirus in children and stated that only four percent of AFM patients tested positive for rhinovirus. *Id.* at 2 (citing Tracy Ayers et al., *Acute Flaccid Myelitis in the United States: 2015–2017*, 144 Pediatrics 1 (2019)). Dr. Steinman clarified that his opinions were offered not "to scientifically *prove* that the subject vaccines caused R.W.'s injury, only that they *could*." Decision at 20 (citing Second Steinman Rep. at 4–5).

At the hearing, Dr. Steinman testified that R.W.'s sensory abnormalities and loss of sensation were more consistent with a TM diagnosis than with AFM. *Id.* at 21 (citing Tr. at 85). He also identified scientific literature supporting an association between TM and vaccination, with onset usually occurring within days to months of vaccination, as R.W.'s symptoms had. *Id*. (citing Tr. at 86–88).

Dr. Steinman acknowledged certain symptoms, including R.W.'s protein levels and the gray matter involvement in her spinal cord, could indicate either TM or AFM. *Id*. (citing Tr. at 90–91). But other findings weighed in favor of TM. For example, no viruses were found near R.W.'s spinal lesion (the abnormality in her spinal cord), making a virally mediated etiology less

---

[4] AFM (acute flaccid myelitis) and AFP (acute flaccid paralysis) are technically distinct conditions, though the medical community has only clearly distinguished between them in recent decades. Decision at 23–24, 50. "AFM," which reflects modern medical understanding, is a spinal cord condition involving the gray matter of the spinal cord, causing muscle weakness and loss of reflexes. *Id*. at 50. AFM is categorized as a subset of AFP and often refers to cases of AFP with a specific viral cause. *Id*. Petitioners' and Respondent's experts dispute whether R.W.'s treating physicians at Duke used the two terms interchangeably, as is still somewhat common, or used them to refer to distinct diagnoses of R.W.'s symptoms. *See* Decision at 23, 25.

probable. *Id*. (citing Tr. at 94). Additionally, R.W.'s MRI demonstrated "an increasing, longitudinally extensive lesion, which would be seen in TM but likely not in AFM." *Id.* (citing Tr. at 98, 105–06).

In his rebuttal testimony, Dr. Steinman explained R.W.'s failure to improve with treatment did not preclude a TM diagnosis. *Id.* at 27 (citing Tr. at 355–56 (citing Benjamin Greenberg et al., *Acute flaccid myelitis: long-term outcomes recorded in the CAPTURE study compared with paediatric transverse myelitis*, 3 BJM NEUROL. OPEN 1 (2021)). When presented with R.W.'s Duke MRI, which revealed an absence of abnormal spinal cord enhancement, he acknowledged "he had never seen a TM patient without such enhancement" but added, "I think it's certainly inflammatory myelitis, myelitis being a term that connects AFM to TM anyway." *Id*. at 28 (citing Tr. at 369, 372). He noted several of R.W.'s other symptoms were consistent with either diagnosis. *Id*. (citing Tr. at 383–85, 387–88).

**c. Respondent's Expert, Dr. Michael Sweeney**

Dr. Michael Sweeney, a pediatric neurologist specializing in treating children with autoimmune or inflammatory nervous system conditions, submitted an expert report and testified on behalf of Respondent. *See* Sweeney Rep. He concluded R.W.'s proper diagnosis was AFM rather than TM due to the rapid onset of symptoms, flaccid weakness, absent reflexes, and inflammation concentrated in the gray matter of the spinal cord. *Id.* at 3. TM, by contrast, tends to develop over a longer period, affects a patient's ability to feel sensation, targets white matter in the spinal cord, and is more likely to respond to treatment. *Id.* Dr. Sweeney acknowledged R.W.'s sensory loss was atypical for AFM. *Id.* at 5. He noted, however, that sensory loss is not impossible in AFM patients and that the medical evidence on this point remains inconclusive. *Id.*

Dr. Sweeney explained that a growing body of evidence links AFM to various strains of enterovirus. *Id*. at 4 (citing Ryan D, Schubert, et al., *Pan-viral serology implicates enteroviruses in acute flaccid myelitis*, 25 NATURE MED. 1748 (2019)). Identifying a specific virus in AFM patients is often difficult, but among AFM cases reported to the CDC in 2018, over half had tested positive for some strain of enterovirus or rhinovirus. *Id.* Dr. Sweeney also stated no causal connection has been established between any vaccination and AFM. *Id*. at 5. He concluded R.W.'s MRI findings were consistent with AFM and her overall presentation aligned with other reported AFM cases. *Id.*

Turning to R.W.'s MRI results, Dr. Sweeney noted that the enhancement of R.W.'s cauda equina nerve root was consistent with AFM and is not typical of other forms of myelitis. Decision at 24 (citing Tr. at 199). Her MRIs also showed inflammation concentrated in the gray matter of her spinal cord, another characteristic typical of AFM rather than TM. *Id.* at 25 (citing Tr. at 227). Dr. Sweeney did not believe R.W.'s sensory involvement ruled out AFM because her primary presenting symptom was weakness, and the sensory deficits that followed may have resulted from swelling and inflammation of the spinal cord. *Id*. (citing Tr. at 232–33). While Dr. Sweeney acknowledged R.W. displayed some symptoms associated with TM—including bowel and bladder dysfunction and sensory loss—he did not find any of these features dispositive, as they can appear in both conditions. *Id.* (citing Tr. at 234–35, 252, 257–58). He noted that an initial TM diagnosis was understandable before the full picture emerged from further testing. *Id.* (citing Tr. at 234).

Dr. Sweeney ultimately concluded R.W. had AFM caused by the A29 Rhinovirus, and testified that, in his opinion, she would not have developed AFM at that time had she not contracted the virus. *Id.* at 26 (citing Tr. at 268, 271).

**d. Respondent's Expert, Dr. Neil Romberg**

Dr. Neil Romberg, a clinical immunologist and professor of pediatric immunology at the Children's Hospital of Philadelphia, also submitted an expert report and testified on behalf of Respondent. *See* Romberg Rep. In his report, Dr. Romberg concluded R.W.'s symptoms were more consistent with a diagnosis of AFP, which he referred to as AFM.[5] *Id.* at 4. He cited research finding approximately 18% of AFM patients test positive for rhinovirus or similar viruses, and noted R.W.'s positive rhinovirus test at the onset of her symptoms was consistent with patterns seen in other pediatric AFM patients. *Id.* (citing Kevin Messacar et al., *Acute Flaccid Myelitis: A Clinical Review of US Cases 2012–2015,* 80 ANN. NEUROL. 326 (2016)).

Dr. Romberg offered several reasons why Dr. Steinman's molecular mimicry theory did not apply here. First, there is little epidemiological data linking AFM to the vaccines R.W. received. *Id.* at 5. Second, R.W.'s tests did not reveal autoantibodies that would indicate the presence of mimicry. *Id.* Third, the metric Dr. Steinman used to identify matching amino acid sequences was too broad, making the "vast majority" of the matching sequences not immunologically relevant (i.e., not capable of triggering the immune response at issue). *Id.* at 5–6. Fourth, no animal studies have reproduced AFM in connection with the vaccines at issue, but animal models have developed AFM after being injected with live enteroviruses. *Id.* at 11 (citing Alison M. Hixon et al., *A mouse model of paralytic myelitis caused by enterovirus D68,* 13 PLOS PATHOGENS 1 (2017)).

Dr. Romberg further noted R.W. had previously received five doses of the Tdap vaccine without any adverse effect, "making it unlikely that her condition was caused by that vaccine." Decision at 17 (citing Romberg Rep. at 12). At the hearing, Dr. Romberg explained AFM cannot be caused by a dead (inactivated) vaccine like Tdap, because it contains no live virus capable of infecting cells. *Id.* at 26 (citing Tr. at 302). He further testified that while he did not believe molecular mimicry could cause AFM, it could apply to TM because TM is an autoimmune disease. *Id.* at 27 (citing Tr. at 335). Dr. Romberg's overarching finding was that "[a] post-viral etiology was the most likely cause of R.W.'s neurologic disease." Romberg Rep. at 12.

**e. Petitioners' Post-Hearing Neuroradiology Expert, Dr. David Wilson**

Dr. David Wilson, a radiologist and professor in the Department of Radiology and Biomedical Imaging at the University of California San Francisco, submitted a post-hearing expert report on behalf of Petitioners. *See* Wilson Rep. He reviewed six of R.W.'s MRI scans and concluded her results were distinct from the AFM cases described in the medical literature. *Id.* at 6. Specifically, her scans showed no involvement of the brainstem, the abnormalities extended into both the gray and white matter of the spinal cord, the cord abnormalities appeared

---

[5] Dr. Romberg uses the terms AFP and AFM synonymously throughout his report but primarily refers to R.W.'s condition as AFP. Decision at 15; *see* Romberg Rep. at 4 ("Acute flaccid paralysis (also known as acute flaccid myelitis) is caused by damage to the anterior horn cells.").

in a "patchy" pattern, and the most pronounced abnormalities were in the distal thoracic spinal cord and the conus. *Id.* Dr. Wilson also observed R.W.'s MRIs showed cauda equina enhancement, a pattern typically associated with GBS or another autoimmune process, though it has also been seen in patients with AFM. *Id.* at 4–6. He recommended other conditions be considered for R.W., including TM and GBS. *Id.* at 6.

#### f. Respondent's Post-Hearing Neuroradiology Expert, Dr. William Zucconi

Dr. William Zucconi, a neuroradiologist and professor of radiology at Dartmouth's Geisel School of Medicine, submitted a post-hearing expert report on behalf of Respondent. *See* Zucconi Rep. Based on R.W.'s imaging, Dr. Zucconi identified T2 signal hyperintensity within the spinal cord's gray matter, which he described as "the hallmark of AFM." *Id.* at 6. Comparing R.W.'s earlier and later MRI scans, Dr. Zucconi noted the T2 signal changes had expanded over time, and the later imaging showed enhancement in the ventral nerve roots and dorsal horns of the central gray matter. *Id.* at 4–5. In his view, these findings were more consistent with AFM than with TM or GBS. *Id.* at 6–7. Dr. Zucconi concluded R.W. met the CDC's diagnostic criteria for AFM, which include the MRI finding of a spinal cord lesion largely confined to gray matter and spanning one or more spinal segments, with or without enhancement of the ventral nerve roots. *Id.* at 6. He ultimately concluded R.W.'s symptoms were most likely the result of virally mediated AFM. *Id.* at 7.

## II. Standard of Review

The Vaccine Act created the National Vaccine Injury Compensation Program to compensate people presumed or proven to be injured by certain vaccines. 42 U.S.C. § 300aa-10 *et seq.* Petitions alleging injuries caused by a vaccine must be filed in the United States Court of Federal Claims, where a special master initially reviews and issues a decision on the petition. *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 228 (2011) (citing 42 U.S.C. §§ 300aa-11(a)(1), 300aa-12(d)(3)).

"Fact findings are reviewed . . . under the arbitrary and capricious standard; legal questions under the 'not in accordance with law' standard; and discretionary rulings under the abuse of discretion standard." *Munn v. Sec'y of Health & Hum. Servs.*, 970 F.2d 863, 870 n.10 (Fed. Cir. 1992). When reviewing a special master's factual findings, this Court does "not reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder." *Porter v. Sec'y of Health & Hum. Servs.*, 663 F.3d 1242, 1249 (Fed. Cir. 2011) (citation omitted); *see Snyder ex rel. Snyder v. Sec'y of Health & Hum. Servs.*, 88 Fed. Cl. 706, 718 (2009) ("*Snyder I*") ("[T]he law is settled that neither the Court of Federal Claims nor the Federal Circuit can substitute its judgment for that of the special master merely because it might have reached a different conclusion.").

A special master must "consider the relevant evidence of record, draw plausible inferences and articulate a rational basis for her decision." *Hines ex. rel. Sevier v. Sec'y of Health & Human Servs*., 940 F.2d 1518, 1528 (Fed. Cir. 1991) (citation modified); *see* 42 U.S.C. § 300aa-13(b)(1). A special master does not need to "discuss every item of evidence in the record" when making a factual finding "so long as the decision makes clear that the Special

Master fully considered a party's position and arguments on point." *Snyder v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 461, 466 (1996) ("*Snyder II*"), *aff'd*, 117 F.3d 545 (Fed. Cir. 1997) (citation omitted). A special master's decision is often "based on the credibility of the experts and the relative persuasiveness of their competing theories." *Broekelschen v. Sec'y of Health & Hum. Servs.*, 618 F.3d 1339, 1347 (Fed. Cir. 2010) (citing *Lampe v. Sec'y of Health & Hum. Servs.*, 219 F.3d 1357, 1362 (Fed. Cir. 2000)). "And a special master's credibility findings 'are virtually unchallengeable on appeal.'" *Sims v. Sec'y of Health & Human Servs.*, 177 Fed. Cl. 283, 295 (2025) (citing *Lampe*, 219 F.3d at 1362).A petitioner has two avenues to receive compensation for alleged vaccine injuries. *Munn*, 970 F.2d at 865. First, a petitioner may show by a preponderance of the evidence that she suffered an injury listed on the Vaccine Injury Table within the specified timeframe. *Capizzano v. Sec'y of Health & Hum. Servs.,* 440 F.3d 1317, 1319 (Fed. Cir. 2006). That the vaccine caused the Table injury is presumed. *Id*. at 1320. Alternatively, a petitioner can allege an off-Table injury when her injury is not listed on the Table or if she did not suffer the injury within the prescribed timeframe. *de Bazan v. Sec'y of Health & Hum. Servs*., 539 F.3d 1347, 1351 (Fed. Cir. 2008). For off-Table injuries, a petitioner must show by a preponderance of the evidence that the vaccine caused the injury. *See* 42 U.S.C. § 300aa–11(c)(1)(C)(ii)(1); *Althen v. Sec'y of Health & Hum. Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005). Here, an off-Table injury is at issue.

The U.S. Court of Appeals for the Federal Circuit has defined a petitioner's causation burden for off-Table claims in what is known as the "*Althen* test." Petitioners must show by preponderant evidence that the vaccination brought about the injury by providing: "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen*, 418 F.3d at 1278.

However, the "question of causation is not reached" in cases where the petitioner is unable to prove the existence of her injury by a preponderance of the evidence. *Lombardi v. Sec'y of Health & Hum. Servs.*, 656 F.3d 1343, 1353 (Fed. Cir. 2011). The Federal Circuit has established where "the existence and nature of the injury itself is in dispute, it is the special master's duty to first determine which injury was best supported by the evidence presented in the record." *Id.* at 1352; *see Broekelschen*, 618 F.3d at 1346 (declining to apply the *Althen* test where "the injury itself is in dispute, the proposed injuries differ significantly in their pathology, and the question of causation turns on which injury [petitioner] suffered"); *Stillwell v. Sec'y of Health & Hum. Servs.*, 118 Fed. Cl. 47, 58–59 (2014) ("[T]he petitioner has the burden of proving, by the preponderance of the evidence, that they are actually afflicted by the injury which, under their theory of vaccine-induced injury, was caused by the vaccine."), *aff'd*, 607 F. App'x 997 (Fed. Cir. 2015). Once a petitioner has shown evidence of the injury alleged by preponderant evidence, the special master may apply the *Althen* test "to determine causation of that injury." *Lombardi*, 656 F.3d at 1352 (citing *Broekelschen*, 618 F.3d at 1346).

Petitioners may satisfy the first *Althen* prong by demonstrating the vaccine at issue is capable of causing the alleged injury. *Althen*, 418 F.3d at 1278; *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355–56 (Fed. Cir. 2006). To make this showing, "a petitioner must provide a reputable medical or scientific explanation that pertains specifically to the petitioner's case, although the explanation need only be legally probable, not medically or scientifically certain." *Broekelschen*, 618 F.3d at 1345 (internal citation omitted). As the Federal Circuit has explained, "simply identifying a plausible theory of causation is insufficient

for a petitioner to meet her burden." *LaLonde v. Sec'y of Health & Hum. Servs.*, 746 F.3d 1334, 1339 (Fed. Cir. 2014) (citation modified).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278. "[M]edical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'" *Capizzano*, 440 F.3d at 1326 (quoting *Althen*, 418 F.3d at 1280). However, "there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct—that it must be accepted in its entirety and cannot be rebutted." *Snyder*, 88 Fed. Cl. at 745 n.67. "[T]he opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases." *Reichert v. Sec'y of Health & Human Servs.*, No. 16-697V, 2018 WL 4496561, at *12 (Fed. Cl. Aug. 2, 2018). Treating physicians' opinions should be weighed against contrary evidence in the record, including conflicting opinions of other physicians. *Id.*; *see Hibbard v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 742, 749 (2011) (affirming special master who weighed competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012).

To satisfy the third *Althen* prong, a petitioner must establish a "proximate temporal relationship" between the vaccination and the alleged injury. *Althen*, 418 F.3d at 1278. Whether Petitioners satisfied the third *Althen* prong is not disputed in this case. Decision at 53 (finding Petitioners met their burden under the third *Althen* prong because Respondent's experts "did not dispute that the onset of R.W.'s condition about 16 days after vaccination was medically appropriate").

## III. Discussion

The Special Master found Petitioners did not meet their burden to show (1) R.W. suffered from TM, the injury alleged, or (2) the vaccines caused R.W.'s injury. Decision at 2. She instead concluded R.W. more likely suffered from AFM, an illness with no causal mechanism linking it to vaccination, and therefore denied compensation under the Vaccine Act. *Id.* at 45–51.

Petitioners argue the Special Master's conclusion as to R.W.'s diagnosis was arbitrary and capricious. Mot. at 7–13. In their view, the Special Master "discounted a multitude of medical records, treating physicians' opinions, imaging and testing that the diagnosis was TM and not AFM and unjustifiably relied on Respondent's experts [sic] opinions to the exclusion of Petitioner's Experts." *Id.* at 7. Petitioners further argue the Special Master erred when she "did not give deference to the treating physicians," who are "likely to be in the best position to determine whether the vaccination was the reason for the injury." *Id.* at 13 (citation modified).

Respondent argues the Special Master's finding as to R.W.'s injury is well supported by the record and Petitioners' Motion "amounts to an impermissible request that this Court reweigh the evidence." Resp. at 4.

The Court is mindful of what this family has endured and the severity of R.W.'s health condition. But based on the record and applicable law, Petitioners' Motion must be denied. Special Master Shah's findings are consistent with binding precedent and do not reflect arbitrary or capricious reasoning requiring reversal.

The Special Master did not err in concluding Petitioners failed to prove R.W. suffered from TM by a preponderance of the evidence—a finding sufficient to resolve the Motion on its own. *See Lombardi*, 656 F.3d at 1353 ("In the absence of a showing of the very existence of any specific injury of which the petitioner complains, the question of causation is not reached."); *see also Broekelschen*, 618 F.3d at 1346. Accordingly, the Special Master could have ended her analysis with the injury finding. The Court nonetheless also upholds the Special Master's conclusion that Petitioners failed to show by preponderant evidence the vaccines at issue caused R.W.'s injury.

### A. The Special Master's Determination on Injury Was Not Arbitrary or Capricious.

A special master's determination of the injury suffered by a petitioner in a Vaccine Act case is a factual finding evaluated by the Court under an arbitrary and capricious standard. *Althen*, 418 F.3d at 1278; *Hibbard*, 698 F.3d at 1363. If the special master's conclusion is based on evidence that is "not wholly implausible," the Court is "compelled to uphold it as not being arbitrary or capricious." *Lampe*, 219 F.3d at 1363 (citation modified).

Because R.W.'s injury itself is disputed, Special Master Shah properly determined which injury was most plausible before turning to causation. *See Lombardi*, 656 F.3d at 1353. Given the extensive and evolving medical record documenting R.W.'s treatment, that determination required a careful review of the evidence. The Special Master undertook such a review, considering the records and testimony of numerous treating physicians and five medical experts, along with scientific literature describing the features that distinguish TM from AFM. *See, e.g.*, Decision at 43 (discussing a 2016 study by Messacar comparing the features of TM, AFM, GBS, and ADEM and a 2019 paper by Helfferich describing the common signs, symptoms, results and imaging findings in acute TM, AFM, and GBS).

TM and AFM have overlapping symptoms, and R.W.'s treating physicians initially favored a TM diagnosis. *See* Decision at 25 (citing Tr. at 234) (describing Dr. Sweeney's testimony that an early TM diagnosis was understandable before the full clinical picture emerged). But as more information became available, including MRI comparisons and R.W.'s lack of response to immunotherapies, the Special Master found AFM emerged as the more likely diagnosis. Decision at 45–51. The Decision identifies six key factors underlying that finding:

> (1) her imaging; (2) her acute onset, the pain she had at onset, and the quick progression of her symptoms; (3) the persistent absence of reflexes and low muscle tone in her affected limbs; (4) her failure to meaningfully respond to any type of immunotherapy; (5) her positive test for rhinovirus [A29]; and (6) the opinions of her treating physicians at Duke, who had the benefit of a comprehensive set of images and test results and a relatively complete view of her clinical course.

*Id.* at 45.

When weighing the competing expert interpretations of R.W.'s MRIs, the Special Master focused on which imaging features were more consistent with AFM versus TM. Decision at 45–46. Dr. Wilson concluded the imaging suggested an autoimmune process because the abnormalities (indicated by T2 hyperintensity) were concentrated in the distal thoracic spinal cord and extended into both the gray and white matter of the spinal cord. *Id.* at 45 (citing Wilson

Rep. at 2–3, 6). While acknowledging the T2 signal abnormality was unusual for AFM, Dr. Zucconi pointed to enhancement on later images "limited to the central gray matter and anterior horns," and noted cauda equina enhancement often has delayed onset in AFM, consistent with R.W.'s case. *Id.* at 46 (citing Zucconi Rep. at 6). Persuaded by the combination of these findings—gray-matter-predominant T2 hyperintensity plus delayed cauda equina enhancement—the Special Master concluded R.W.'s imaging pointed toward AFM rather than TM. *Id.*

R.W.'s acute onset also weighed in favor of AFM over TM. Only five hours elapsed between the onset of pain in R.W.'s right thigh and her presentation to the emergency room with decreased sensation and weakness in both legs. Decision at 47 (citing Pet'rs' Ex. 5 at 11). The Special Master credited Dr. Sweeney's testimony that such a rapid onset is characteristic of AFM, which presents suddenly and progresses rapidly, often preceded by limb pain, whereas TM generally develops over a longer period. *Id.* (citing Tr. at 200).

The Special Master also found R.W.'s absent reflexes and reduced muscle tone indicative of AFM. *Id.* at 47–48. In TM, patients generally gain brisk reflexes and spastic tone over time, but R.W. never developed either. *Id.* at 47. While Dr. Steinman testified that he had seen persistent flaccid limbs and absent reflexes—like R.W.'s—in about 15-20% of his TM cases, the Special Master noted Dr. Steinman did not dispute that this presentation is characteristic of AFM, as set forth in the literature. *Id.* at 48 (citing Tr. at 381).

On R.W.'s lack of response to immunotherapy, the Special Master traced R.W.'s full treatment course before concluding it was more consistent with AFM than TM. *Id.* at 48–49. IVIG and high-dose steroids failed to improve her condition, prompting her transfer to Duke for PLEX treatment; PLEX and repeat courses of IVIG and steroids likewise produced no improvement. *Id.* at 48. The Special Master acknowledged Dr. Steinman's testimony that some TM patients also fail to meaningfully improve with steroids or IVIG, but reasonably concluded that, on balance, this factor still favored AFM. *Id.* at 48–49. She supported her conclusion with the following considerations: first, a greater percentage of TM patients than AFM patients report improvement with steroids or IVIG; second, most "AFM patients with both white and gray matter involvement (like R.W.) had no or minimal improvement with either steroids or IVIG"; and third, the literature upon which Petitioners relied did not address PLEX response in either TM or AFM patients, whereas R.W.'s own treating rheumatologists believed her condition would have responded to PLEX had it been antibody-mediated. *Id.* at 48–49; 48 n.10 (citing Tr. at 432).

The Special Master also discussed R.W.'s positive test for Rhinovirus A29, treating it as further evidence favoring AFM. *Id.* at 49–50. She explained that enterovirus has a statistical association with AFM, and, because of their genetic similarity, enterovirus and rhinovirus could not be reliably distinguished from one another through standard testing methods before 2015. *Id.* at 49 (citing Tr. at 306). Relying on R.W.'s medical records from Duke, the Special Master opined that the pre-2015 studies linking enterovirus to AFM may have captured rhinovirus cases as well, since the two were then indistinguishable. *Id.* (citing Pet'rs' Ex. 5 at 208). The Special Master considered Dr. Steinman's testimony that rhinoviruses are commonly present in children's noses and therefore do not necessarily indicate AFM. *Id.* (citing Tr. at 109–10). But "given the genetic relationship between enteroviruses and rhinoviruses, the data showing enterovirus and rhinovirus positivity in AFM patients, and the recency of the technology capable

of detecting rhinoviruses," the Special Master was reasonably persuaded that R.W.'s positive result weighed in favor of AFM. *Id.* at 50.

In the absence of conclusive diagnostic evidence, it was reasonable for the Special Master to weigh probabilistic factors like typical treatment response and symptom progression among other factors. *See Stillwell*, 118 Fed. Cl. at 60 (holding that the special master reasonably considered "a number of probabilistic factors, such as the typical age of individuals afflicted by [the injury], the typical course of illness, severity of symptoms, and others" when determining petitioner's disease).

The Court's review is limited to whether the Special Master's conclusion was plausible given the record, not whether the Court would have reached the same conclusion itself. *See Snyder I*, 88 Fed. Cl. at 718; *Porter*, 663 F.3d at 1249 (holding that the Court may not "reweigh the factual evidence, assess whether the special master correctly evaluated the evidence, or examine the probative value of the evidence or the credibility of the witnesses—these are all matters within the purview of the fact finder.").

If, as here, a special master "considered the relevant evidence of record, [drew] plausible inferences and articulated a rational basis for the decision, reversible error will be extremely difficult to demonstrate." *Hines*, 940 F.2d at 1528. Because the Special Master's conclusion as to R.W.'s injury is well reasoned and not wholly implausible, this Court must find it was not arbitrary or capricious. *See Cedillo v. Sec'y of Health & Human Servs.,* 617 F.3d 1328, 1338 (Fed. Cir. 2010).

### 1. The Special Master Reasonably Credited the Treating Physicians' Opinions.

Petitioners rely on the principle that treating-physician testimony is entitled to particular weight because "treating physicians are likely to be in the best position to determine whether a logical sequence of cause-and-effect shows that the vaccination was the reason for the injury." Mot. at 18 (quoting *Capizzano*, 440 F.3d at 1326). On that basis, Petitioners argue the WakeMed records of Dr. Honeycutt and Dr. Wooten, and the Duke records of Dr. Gallentine's team "must be given greater evidentiary weight," while "conflicting oral testimony of Respondent should be afforded little evidentiary [weight]." Mot. at 19.

The record does not support Petitioners' allegation that the Special Master improperly discounted the opinion of R.W.'s treating physicians. In fact, the Special Master relied heavily on their findings. She found particularly persuasive the rheumatologists who treated R.W. after Dr. Honeycutt, who had the benefit of additional observation, testing, and imaging. She credited their contemporaneous observation that R.W.'s lack of response to steroid and PLEX treatment was not what they would have expected of an antibody-mediated inflammatory process such as TM. Decision at 48 (citing Pet'rs' Ex. 5 at 205). She likewise credited treating physicians on Duke's neurology and infectious disease teams, who concluded R.W.'s condition was most likely virally mediated based on her successive MRIs and failure to improve with treatment. *Id.* (citing Pet'rs' Ex. 5 at 5–6).

The Special Master acknowledged that Dr. Honeycutt, R.W.'s treating physician at WakeMed, consistently asserted R.W. had TM. *Id.* at 50. But she found his opinion less persuasive than those of the other treating physicians and experts because it was "unclear

whether Dr. Honeycutt reviewed the complete set of medical records and/or imaging," and he did not "explain[] the basis of his expertise in distinguishing AFM from TM." *Id.* at 50–51. Assessing the relative credibility and persuasiveness of a particular treating physician's opinion is squarely within a special master's role as fact finder. *See Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993) (finding a special master should assess each witness's credibility when determining the weight their testimony should be afforded); *Martin v. Sec'y of Health & Hum. Servs.*, 158 Fed. Cl. 459, 480 (2020) ("The Special Master has discretion to determine the relative weight of evidence presented, including contemporaneous medical records and oral testimony.").

Petitioners separately argue R.W.'s treating physicians at Duke never actually diagnosed AFM, and the Special Master erred in adopting the "unsubstantiated theory that Duke was using the terms AFP and AFM interchangeably and that the Duke diagnosis was AFM and not TM." Mot. at 8–9. But the Special Master addressed and explained her reasoning. Decision at 50. She found persuasive Respondent's experts, Drs. Sweeney and Romberg, who clarified that because AFP is a precursor term to AFM, distinguished only by AFM's specific viral cause, interchangeable use of the terms would not be unusual. *Id.* (citing Tr. at 242–43; Romberg Rep. at 4). Even accepting Petitioners' assertion that Duke treated AFP and AFM as distinct diagnoses, the Special Master points out "at the time of discharge, the Duke team specifically characterized her condition as 'acute flaccid myelitis.'" *Id.* at 50 (citing Pet'rs' Ex. 5 at 6).

The Special Master's well-documented weighing of the treating-physician record, and her resulting conclusion that it did not support a TM diagnosis, was "well within the discretion granted to special masters under the vaccine program." *Lombardi*, 656 F.3d at 1354.

**2. The Special Master Reasonably Credited Petitioners' Medical Experts.**

Petitioners raise a parallel objection to the Special Master's treatment of the parties' experts, arguing she "unjustifiably relied" on Respondent's experts "to the exclusion of Petitioner's Experts." Mot. at 7. But while the Special Master ultimately found Respondent's experts more persuasive, she did not "unjustifiably rel[y]" on their opinions over Petitioners'. Resp. at 5. She addressed the positions of Petitioners' own experts throughout her Decision, identifying where, and why, she found particular explanations unpersuasive. *See Broekelschen*, 618 F.3d at 1347 (finding, where both sides offer expert testimony, a special master's decision may properly rest on "the credibility of the experts and the relative persuasiveness of their competing theories").

Several examples illustrate careful evaluation by the Special Master. She considered Dr. Wilson's opinion that R.W.'s MRIs were inconsistent with AFM because the imaging did not show a lesion in the central cord in the cervical region—instead showing a process in the distal thoracic cord—and the T2 hyperintensity did not localize to the anterior horn. Decision at 45–46 (citing Wilson Rep. at 2–3, 6). However, she found Dr. Zucconi's view more persuasive: that the imaging was consistent with AFM as described in the literature due to the involvement of gray matter, T2 signal hyperintensity, and ventral nerve root enhancement. *Id.* at 46 (citing Zucconi Rep. at 6–7). She also addressed Dr. Steinman's testimony that R.W.'s failure to develop brisk reflexes and spasticity was consistent with TM, noting Dr. Steinman did not dispute the presentation is also characteristic of AFM. Decision at 48.

The Special Master gave similar attention to Dr. Steinman's opinion that R.W.'s failure to respond to PLEX or IVIG treatments did not rule out TM, since some TM patients do not respond to those treatments. Decision at 48. She observed that the study Dr. Steinman cited for his proposition addressed only patients' responses to steroids, not PLEX. However, R.W.'s treating rheumatologists specifically stated they would have "expected PLEX to rapidly improve any antibody mediated inflammatory process" as the basis for their opinion. *Id.* (citing Pet'rs' Ex. 5 at 205) (citation modified). She also weighed the parties' competing literature, noting, for example, that a 1996 study Dr. Wilson cited to support a TM diagnosis predated the current TM diagnostic criteria and the "developments that have since narrowed the definition" of the disease. Decision at 46 n.8 (quoting Zucconi Rep. at 6).

These examples demonstrate reasoned weighing of competing testimony and medical literature within the Special Master's mandate. *See Hibbard*, 100 Fed. Cl. at 749 (finding it was appropriate for the special master to weigh competing expert testimony, as well as examine the evidence "in the context of records from other doctors" (citation omitted)).

**B. The Special Master Did Not Err In Finding Lack of Causation.**

Petitioners argue "[a] petitioner need not diagnose her injury, she must merely show that the vaccine in question caused her injury – regardless of the ultimate diagnosis." Mot. at 14. They further contend that even if the Court rejects a TM diagnosis, they need only "offer evidence that the vaccine caused the injury, not specific to TM." *Id.* at 15. The law does not support this assertion. A petitioner instead bears "an affirmative burden of showing, by the preponderance of the evidence, that she actually suffers from the specific injury she alleges was caused by the vaccination." *Stillwell*, 118 Fed. Cl. at 60; *see Hibbard*, 698 F.3d at 1365.

By predicating their theory of vaccine-induced injury on a TM diagnosis, Petitioners assumed the burden of proving TM by preponderant evidence. *See Stillwell*, 118 Fed. Cl. at 60. And while the finding that R.W. did not suffer from TM independently forecloses Petitioners' claim, see *Lombardi*, 656 F.3d at 1352–53, the Special Master nevertheless went on to analyze whether Petitioners satisfied causation under *Althen*. The Court agrees with the Special Master's conclusion: because R.W.'s TM diagnosis was a "necessary component of [Petitioners'] theory of vaccine-induced injury," *Hibbard*, 698 F.3d at 1365, causation under *Althen* was not established.

The Special Master discusses multiple instances in the record supporting Petitioners' claim that TM, specifically, can be triggered by vaccination. *See* Decision at 21 (citing Tr. at 86–88) (describing Dr. Steinman's testimony that an association exists between TM and vaccines, with symptom onset typically occurring "days to months" after vaccination); *id.* at 20 (citing First Honeycutt Aff. at 2) (stating "[t]ransverse myelitis after vaccination is reported in medical literature"); *id.* at 13 (citing First Steinman Rep. at 7) (describing Dr. Steinman's molecular mimicry theory linking the vaccines at issue to TM). AFM, by contrast, has no such association in the record. *See id.* at 26 (citing Tr. at 307) (describing Dr. Romberg's testimony that there is "no epidemiologic evidence linking the subject vaccines and AFM"); *id.* at 19 (citing Sweeney Rep. at 5) (explaining Dr. Sweeney's position that "no causal link has been found between any vaccination and AFM"); *id.* at 52 (noting Dr. Steinman did not rebut Dr. Romberg's position that there is no mechanism by which an inactivated vaccine like Tdap could cause AFM). Because the preponderant evidence demonstrated a vaccine could cause TM but not

AFM, the Special Master concluded Petitioners "failed to prove the *Althen* prongs with respect to a claim that the subject vaccines caused R.W. to develop AFM." *Id.* at 51–52.

Without proof of causation, the Special Master found Petitioners "also cannot show a logical sequence of cause and effect between the subject vaccines and R.W.'s AFM." *Id.* at 52; *see Althen*, 418 F.3d at 1278. She reiterated that although the WakeMed physicians attributed R.W.'s injury to vaccination, the Duke team's conclusion that the injury was virally-mediated was more persuasive because it rested "on a more complete picture of R.W.'s course." Decision at 52–53.

The Special Master's conclusions as to causation are supported by the record. *See Veryzer v. Sec'y of Health & Hum. Servs.*, 100 Fed. Cl. 344, 354 (2011) (holding it was not arbitrary or capricious for a special master to conclude a claimant did not prove causation where the decision reflects a considered review of the expert evidentiary record), *aff'd*, 475 F. App'x 765 (Fed. Cir. 2012). Because the Special Master's review of the record was reasonable, the Court must defer to her findings and ultimate ruling.

## IV. Conclusion

For the foregoing reasons, the Court holds that the Special Master's rulings were in accordance with law and that her factual findings were not arbitrary and capricious. The Special Master's March 5, 2026 Decision denying compensation is **AFFIRMED**. ECF No. 82. Petitioners' Motion for Review is **DENIED**. ECF No. 85. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Carolyn N. Lerner
CAROLYN N. LERNER
Judge